Filed 1/9/15  In re A.M. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E061396 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1200719) |
| v. | OPINION |
| L.M. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Tamara Wagner, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant L.M. (mother).

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant A.M. (father).

1

Gregory P. Priamos, County Counsel and Anna M. Marchand, Deputy County Counsel, for Plaintiff and Respondent.

Appellants are the mother and father of three children – A.M, T.M., and J.M. These children were, respectively, ages nearly 5, 4, and 2 on the date of the challenged order. Both parents argue the juvenile court erred when it failed to find that the beneficial parental relationship exception to the preference for adoption applied at the hearing held on June 19, 2014 pursuant to Welfare and Institutions Code section 366.26.[1] For the reasons discussed below, we affirm the court's orders.

## FACTS AND PROCEDURE

*Previous Referrals and Detention – September 2011 to July 2012*

The Department of Public Social Services (DPSS) received a referral in September of 2011, alleging general neglect by the parents. The referral was closed as inconclusive and the parents were advised to keep their medical marijuana out of reach of the children.

DPSS received a referral in October of 2011, again alleging general neglect. The referral was closed as unfounded after a safety plan was implemented that included requiring the paternal uncle to vacate the residence because of his heroin use.

In May of 2012, DPSS received a 10-day response referral alleging general neglect. Mother tested positive for THC after giving birth to J.M. and told hospital staff

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

that she must have been exposed to second-hand smoke from father, who smoked medical marijuana. Mother also asked for morphine to treat a headache.

On May 31, 2012, the social worker attempted an unannounced home visit but was unable to enter the residence. The family's residence was a converted garage behind a fence. The occupant of the house at the front of the property was unavailable to secure the dogs in the yard.

On June 13, 2012, the social worker was able to access the residence for an unannounced home visit. The residence had one bedroom and one bathroom. The three children and their 7-year-old half-sister slept in the bedroom and the parents slept in the living room. Beer cans were strewn around the outside of the residence and a collapsible swimming pool was on the front porch with two feet of water in it. The inside of the home was in disarray but there were no obvious safety hazards other than the pool. Mother stated she had used marijuana a few days after coming home from the hospital, but stated she did not like marijuana and had no history of drug use. Mother also denied domestic violence and mental health issues, but stated she suffered from intestinal and cervical cancer. Mother stated that her medical marijuana card had expired, but that father had one and still used regularly. Mother stated the marijuana was kept in a locked box under the television. Upon inspection, the social worker found the box was unlocked and accessible to the children. Father stated he smoked medical marijuana once per day and showed the social worker the plants he grew for personal use. The plants were grown on higher level ground than the residence, and were surrounded by both a wire

3

fence and debris. Both mother and father submitted to a saliva drug test. Mother tested positive for opiates (she had opiates at the hospital after delivering J.M.) and father tested negative for all substances. The children showed no signs of abuse. They were dirty but appeared to be well fed. The social worker stressed the importance of keeping the marijuana out of reach of the children and of father smoking only out of doors and away from the children. Both parents were asked to undergo a drug urine test and agreed to do so. Father did not drug test but mother did. Mother's results were positive for marijuana.

The social worker returned to the family residence on June 28, 2012. She noticed the marijuana lockbox on the bathroom counter. It was unlocked and contained marijuana, a pipe and a lighter. The social worker again instructed mother to keep it locked and out of reach of the children. The social worker interviewed the children's 7-year-old half-sister in the bedroom, the floor of which was covered with discarded clothing. The half-sister stated that the paternal uncle had stayed in the home for a couple of days the week before, and had visited three times since he was made to move out. She stated that she gets plenty of food to eat and that the parents would sometimes leave her to watch her siblings for 15 minutes while they went to the liquor store. She denied being physically abused, but said that father and her mother sometimes fight and that she had seen them with bloody injuries from fighting. The half-sister said that she once had to make father let go of her mother when he was choking mother. She also stated that mother normally takes care of the children while father smokes outside or

4

plays video games.  The half-sister stated that both parents use marijuana, but that they smoke it outside while telling her and the children to play inside.

On July 11, 2012, shortly after noon, the social worker visited the home unannounced, along with the Sheriff's Drug Endangered Children team.  Mother was at home with the three children and their half-sister.  Mother was at that time on probation, for either shoplifting or burglary, which allowed the team to check the residence for drugs.  She told the team that father was working trimming trees at another location, and that she had just been sleeping.  The team found the two middle children, A.M. and T.M., eating bagels from a package on the floor, which was covered with ants.  Both had diaper rash.  A strong odor of marijuana led to the bathroom, where the team found marijuana and items used to infuse edible items with THC.  These items were in a drawer accessible to the children.  The floor of the children's room was covered with debris so as to constitute a safety hazard.  The infant J.M. was lying in his bassinette with a bottle of spoiled formula.  He was bundled up although the temperature was in the high 80s, and his skin was red and sweaty.  J.M.'s diaper was soiled and mother stated she had last changed him at 2:30 a.m.  Exposed electrical wiring was found in the children's bedroom.  Mother stated that J.M. had been covered with ants the previous day.  The children's half-sister told the team that T.M. would take off his diaper and play with his feces, and showed them where T.M. had smeared feces on the walls and rails of his crib.  Feces was found on T.M.'s hands as he was eating a bagel off the floor.  The floor of the residence in general was filthy, with trampled food on the floor, ants, trash and dirty

dishes all over the kitchen, and full trash containers inside and outside the kitchen. The children were taken into custody because of the state of the home and the continued accessibility of the marijuana to the children. The team investigator planned to file felony charges of Child Endangerment (Pen. Code, § 273a). That same day, all four children[2] were placed with the paternal grandparents.

On July 13, 2012, DPSS filed a section 300 juvenile dependency petition alleging failure to protect under subdivision (b). Specifically, DPSS alleged: the parents kept marijuana within reach of the children; the condition of the home endangered the health and safety of the children; mother has a history of using controlled substances; father refuses to comply with drug testing; the parents engaged in domestic violence in the children's presence, and mother has a criminal arrest history, including for burglary.

At the detention hearing held on July 16, 2012, the juvenile court ordered the children detained, with supervised visits once per week.

*Jurisdiction and Disposition—August 2012*

In a report filed with the juvenile court on August 1, 2012, the social worker reported the children were doing well in placement with their paternal grandparents. The grandparents were facilitating visits at their home with mother and father three evenings per week so the parents could participate in preparing meals and putting the children to bed. The grandparents reported the visits went well and the children looked forward to

---

[2] The seven-year-old half-sister has a different father and was later placed with that father. This appeal concerns only A.M., T.M., and J.M.

them.  The social worker commented that one of the problems requiring intervention was the state of the home's physical environment.  Mother was ill and overwhelmed with the childcare and housework duties, with which father apparently did not provide much help.  The social worker also commented that father "views his role as father as more of a playmate than responsible parent."

In an amended report filed August 29, 2012, the social worker noted both parents had begun in-home parenting education, but had yet to enroll in individual counseling, substance abuse treatment, or random drug testing.  The substance abuse treatment program manager told the social worker that, when the parents eventually attended an intake interview, they seemed "mystified" as to why the children had been removed and denied that either had a substance abuse problem.  When the social worker spoke with mother to encourage her to participate in substance abuse treatment, mother continued to deny that either she or father needed such treatment because they had gotten rid of all their marijuana after the children were detained.

At the jurisdiction hearing held on August 29, 2012, the juvenile court found the allegations in the petition to be true and took jurisdiction over the children.  The court granted the parents reunification services and authorized DPSS to liberalize visitation to unsupervised overnight and weekend visits, up to returning them home on family maintenance based on their progress in the treatment plan.

*Six-Month Review—September 2012 to February 2013*

In the status review report filed February 14, 2013, DPSS recommended extending reunification services to mother and father. The social worker reported that mother was hospitalized on September 6, 2012 for kidney problems. Mother was released from the hospital on November 15, 2012. Mother was incarcerated from November 16, 2012 to January 4, 2013. Mother stated this was because she had failed to appear for a hearing on her previous shoplifting offense. The social worker found on the superior court website an arrest for shoplifting and a six-week incarceration. Mother was unable to participate in reunification services during this period. Father stated that he also was unable to participate in services because he was needed to care for and support mother. Father tested negative for drugs twice in September 2012, but tested positive twice in October 2012 and no-showed twice in November 2012, after which he was removed from random drug testing. The paternal grandparents reported that mother consistently attended the three-times weekly visits with the children when she was not in the hospital or incarcerated. Father also visited consistently, including while mother was unavailable.

At the hearing held on February 27, 2013, the juvenile court continued reunifications services to mother and father.

*12-Month Review – March to September 2013*

In the status review report filed August 15, 2013, DPSS recommended terminating reunification services to mother and father, setting a section 366.26 hearing, and reducing visits to once monthly. In January 2013, father was placed on three years of probation for

8

driving under the influence.  The social worker had difficulty contacting both mother and father.  Neither had voicemail on their telephone.  Father in particular never responded to any of the social worker's phone calls, letters and visits, although mother told the social worker that he received all of the information that mother did.  The parents had not yet completed their case plan, although they did both complete in-home parenting education.  After the children's half-sister was placed with her own father in July 2013, she continued to speak with her sibling on the phone every week.  The paternal grandparents stated both parents continued to visit with the children and that the visits went well.  The children appeared to be bonded to their paternal grandparents, and the grandparents expressed interest in adopting the children.

At the 12-month status review hearing held on September 26, 2013, the juvenile court terminated reunification services for mother and father and set a section 366.26 hearing to determine a permanent plan for the children.  The court granted educational rights to the paternal grandparents.

*Section 366.26 Permanency Planning—October 2013 to June 2014*

DPSS filed a report on December 24, 2013, in anticipation of the section 366.26 hearing set for January 28, 2014.  DPSS recommended parental rights be terminated, the children be freed for adoption by the paternal grandparents and visits be reduced to once per month.  The grandparents had previously supervised mother and father's visits with the children without much comment other than that the visits went well.  However, during a visit from the social worker in late November, they expressed that they

suspected the parents had begun to attend visits while under the influence, because the parents sometimes displayed rapid speech, were extremely lethargic, and had fallen asleep while holding the children. The social worker instructed that visits should only take place for an hour each week at a public place. The grandparents were referred for an adoption assessment.

The section 366.26 hearing set for January 28, 2014, was continued to May 28 to allow the adoption assessment to be completed.

DPSS filed an addendum report on May 22, 2014. DPSS maintained its recommendation that parental rights be terminated and the children be freed for adoption by the paternal grandparents. Mother was incarcerated for three months and was released on April 13. Father was incarcerated from December 3, 2013 to March 3, 2014. The adoption assessment refers to these incarcerations as "probation violations stemming from drug related charges." When not incarcerated, both parents were visiting weekly with the children at a park. The grandparents described the visits as "good."

The section 366.26 hearing was continued at the request of mother and father.

Each parent filed a section 388 Request to Change Court Order—father on June 5, 2014 and mother on June 18.

On June 19, 2014, the juvenile court denied the parents' section 388 requests. After receiving into evidence all reports and hearing from counsel for all parties, including counsel for mother and father regarding the parental beneficial relationship

10

exception to the presumption for adoption, the court terminated mother's and father's parental rights and selected adoption as their permanent plan.

Mother and father each filed a notice of appeal.

## DISCUSSION

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)

Adoption involves terminating the legal or parental rights of the child's natural parents. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 574.) In order to avoid termination of parental rights and adoption, a parent has the burden of showing that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) The exceptions permit the court, "in *exceptional circumstances*," "to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

The so-called parental benefit exception applies when there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to . . . the following circumstances: [¶] . . . The parents have maintained regular visitation and contact with the child and the child would benefit from continuing

11

the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "Benefit," for this purpose, means that "the well-being of the child [is promoted] to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

We apply the substantial evidence standard of review to factual issues, such as the existence of a beneficial parental relationship, and the abuse of discretion standard to the discretionary determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530-531; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) The analysis under either standard of review is essentially the same under both standards. As one court explained: "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order that he did.' . . .'" [Citations.]" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

Here, we will assume that both mother and father satisfied the threshold requirement of the parental benefit exception—that they each maintained regular visits and contact with the children. Although both parents were incarcerated for significant periods during the permanency planning stage, the record indicates they both visited regularly with the children throughout the overall dependency. We will also assume for purposes of our analysis that mother and father each had a beneficial parent-child relationship with the children. Mother and father did not, however, establish that any of the three children "would be greatly harmed" by terminating their parental rights, or that the benefit to the children from continuing their relationships with either parent would outweigh the benefit from a stable adoptive home with the paternal grandparents.

The evidence to which father points as showing the children would be greatly harmed by terminating his parental rights, or that the benefit from continuing their relationship with him outweighs the benefit they would receive from having a stable, permanent home with the paternal grandparents, is as follows. First, the grandparents described the children's supervised visits with father as going "well" or being "great." Second, when father was incarcerated, four-year-old A.M. told the social worker that she missed her daddy. Third, after the parents would call and talk to the children while the parents were incarcerated in the fall of 2013, A.M. would get weepy and tearful and talk about the parents for several days.

The evidence to which mother points on this subject is as follows. First, A.M. refused to continue potty training after mother told her that they would work on it

13

together after mother was released from jail. Second, three-year-old T.M. would sometimes act out, kicking the paternal grandmother and telling her that he hates her, but would not exhibit this kind of behavior around "papa." "Papa" is what the children call the paternal grandfather. Third, A.M. would often go get her "blankie" when the social worker came to the house, would become teary and talk about "mommy and daddy."

While it appears from the record that A.M. definitely missed her parents, the evidence does not lead us to conclude that the juvenile court abused its discretion when it determined that the benefit the children derived from their relationships with the parents outweighed the benefit they would receive from a stable and permanent home with the paternal grandparents. First, the social worker who wrote the adoption assessment described the children as very affectionate with the grandparents. The social worker described A.M. as "very bonded and affectionate with 'papa' and 'grandma.'" She went to them numerous times to climb in their laps and give them love and affection." The social worker described J.M. as "very attached and bonded to both of the prospective adoptive parents, but especially to his grandfather . . . [he] would move freely around the house, but would look to his grandparents for love, attention, affection and support." Second, the social worker reported in the adoption assessment that "The oldest children clearly state they wish to live with their grandparents and do not want to live anywhere else." Third, the paternal grandparents are providing the children with a home that is drug-free, clean and without obvious hazards, and in which both caregivers are available to care for the children and to meet their needs for stability, love and affection. Fourth,

the parents never progressed beyond supervised visits, despite the court order authorizing the social worker at the jurisdiction hearing to liberalize visits based upon the parents' progress in the case plan.

To conclude, other than the fact that four-year-old A.M. understandably missed her parents, there is nothing in any of the social workers' reports to suggest that any of the children would suffer great harm as a result of proceeding with adoption and terminating mother's and father's parental rights, especially when the benefit they derived from a relationship with their parents is balanced with the benefit they would receive by being adopted by the paternal grandparents. The juvenile court did not err when it found the beneficial parental relationship exception to the preference for adoption does not apply in this case.

### DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

KING
J.

15